IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO: 4:08-CR-FL-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| DARRYL HANDBERRY | ) | |
| | ) | |
| Defendant. | ) | |

This Cause comes before the Court to submit a memorandum and recommendation on the Defendant's Motion to Suppress. **[DE-35]**. The Defendant seeks the entry of an order suppressing any and all evidence seized by law enforcement officers as a result of the search of his residence on April 9, 2007. The Defendant also seeks to suppress the statements he made to the officers while he was being detained. The Government has filed a memorandum in response. **[DE-39]**. A hearing was held on Friday, May 2, 2008, at 8:30 a.m. **[DE-45].** Accordingly, these motions are now ripe for adjudication.

I.  **Factual Background**

The Defendant was indicted for several offenses including: (1) conspiracy to make false

1

statements in connection with firearms transaction; (2) false statement; and (3) possession and receipt of unregistered firearm. 18 U.S.C. §§ 371, 924 (a)(1)(A) and (2), and 26 U.S.C. §§ 5841, 5861 (d), and 5871. **[DE-1]**. The following facts are undisputed. The Beaufort County Sheriff's Department ("the Sheriff's Department") received information from a cooperating witness ("CW") that the CW could buy cocaine and marijuana from a black male named "D." **[DE-39, p. 2].** On March 27, 2007, the CW contacted the co-Defendant, David Pierre ("Pierre"), later identified as "D," and arranged to purchase cocaine and marijuana from him at Clifton Park Apartments ("the complex"). Id. at 3. The complex is located less than one-half mile from the Defendant's residence at 1124 Bonner Street. Id. The CW proceeded to the complex and purchased marijuana and cocaine from Pierre and another unidentified Black male who was driving a green Jeep. Id.

On March 29, 2007, the CW contacted Pierre again and ordered an eight ball of powder cocaine. Id. Pierre instructed the CW to meet him on Bonner Street near 11th Street. Lieutenant Davenport testified that this location is "[l]ike a half a block toward the south"of the Defendant's residence. [Tr. at 10].[1] The CW met Pierre at the agreed location and purchased the cocaine. **[DE-39, p. 3]**. Subsequently, on April 2, 2007, the CW contacted Pierre again and ordered half an ounce (14 grams) of powder cocaine. Id. Pierre instructed the CW to meet him on Bonner Street near 11th Street. Id. The CW met Pierre at the agreed location and purchased cocaine from him. Id.

The last purchase in this series occurred on April 9, 2007. Id. During this purchase, the Sheriff's Department set up surveillance on 1124 Bonner Street to monitor the drug sale transaction. Earlier surveillance was able to associate Pierre with this address. Id. At approximately 4:30 p.m., the CW called Pierre and ordered 3/4 of an ounce (21 grams) of powder cocaine, pursuant to the

---

[1] Refers to the transcript from the suppression hearing that took place on Friday, May 2, 2008, at 8:30 a.m.

2

instructions of the Sheriff's Department. Id. at 3-4. Pierre instructed the CW to meet him at the complex. Id. at 4.

The deputies, who were conducting surveillance outside of the Defendant's residence, observed Pierre exit the residence and enter a car driven by a white female, later determined to be Megan Midyette ("Midyette"). Id. At approximately 5:05 p.m., Pierre arrived at the complex and completed the drug sale with the CW. Id. Both Pierre and Midyette were detained immediately following the drug sale. Id. Pierre was charged with several drug-related offenses. Id. Midyette was interviewed by the deputies and released without charges. Id. During her interview, she stated that she had gone to the Defendant's residence to purchase marijuana and had nothing to do with the cocaine. Id. The CW was processed by the deputies and allowed to leave the scene. Id.

According to veteran drug investigators in Beaufort County, it is a common practice for drug dealers in high-crime neighborhoods to communicate with each other regarding arrests that occur in the area.[2] Id. at 4-5. As a result of this practice, the target of the search is often able to destroy or move evidence during the period of time it is necessary for law enforcement officers to obtain a search warrant. Id. at 5. To prevent the destruction of evidence in this case, the deputies immediately returned to the Defendant's residence after they arrested Pierre and Midyette. Id. at 4-5. The deputies arrived at the residence at approximately 5:10 p.m. Id. As they approached the door, they heard loud music, knocked, but did not announce their identity, and then turned the unlocked doorknob and entered the residence. Id. at 5. At the hearing, Lt. Davenport testified that as he opened the door, he smelled a strong odor of marijuana. [Tr. at 20].

---

[2] At the hearing, Lt. Davenport testified on cross-examination "I can confirm that every time we arrested somebody in that area, that people are warned and there is nobody to be found." [Tr. at 29]. However, the Court noted that this statement was hyperbolic. [Tr. at 67-68].

3

Once the deputies were inside, the Lieutenant immediately detained the Defendant and discovered a high point pistol underneath his stomach. Id. at 21.[3] In addition, he, and the other deputies, observed cocaine and marijuana, lying on a table in plain view. Id. After detaining the Defendant, the Lieutenant told him that he was going to apply for a search warrant and that the Defendant would be removed from the residence for safety. Id. at 22. The Defendant was then placed in a police vehicle located outside of his residence. Id.

The deputies did not search the residence at this time. Id. However, they did go to the other rooms in the house to ensure that there were no other occupants residing therein. Id. While the deputies stayed at the residence, the Lieutenant went back to the Sheriff's Department to apply for a search warrant. Id. at 23. The search warrant affidavit included details describing: (1) the Sheriff Department's investigation of drug trafficking on Bonner Street; (2) the presence, at the residence, of the green jeep that Pierre used in his first controlled drug sale; (3) Midyette's post-arrest statement; and (4) the evidence of illegal activity that the deputies observed when they entered the residence. **[DE-39-7, pgs. 4-5]**. At approximately, 7:00 p.m., the search warrant was signed by a Magistrate Judge. [Tr. at 23].

Upon returning to the residence, Lt. Davenport advised the deputies of the search warrant and gave it to Investigator Boyd to execute. Id. at 24. When executing the warrant, the deputies uncovered various items of evidence, including a sawed-off shotgun that was hidden under the Defendant's couch. **[DE-39, p. 5]**. While Investigator Boyd was in the process of removing evidence from the residence, the Defendant motioned to him to approach the police vehicle. Id. at

---

[3] Another individual was detained at the time of the officers' warrantless entry. [Tr. at 20-21]. During cross examination at the suppression hearing, Lt. Davenport testified that he wasn't sure if he found the high point pistol under the Defendant, or the other individual. Id. at 33. However, because that individual is not relevant to the analysis in this case, he will not be discussed further.

6. At the hearing, the investigator testified that when he approached the vehicle, the Defendant asked, "what was going on." [Tr. at 56]. Investigator Boyd told him they "were trying to figure out what the deal with the guns were." Id. In response, the Defendant admitted that he bought the shotgun off the street for protection. Id.

## II. Analysis

### A. Two-prong test for exigent circumstances

The Defendant seeks to suppress all of the evidence seized at his residence on April 9, 2007. **[DE-36, p. 9].** He alleges that the law enforcement officers' warrantless entry into his home, was per se unreasonable under the Fourth Amendment, and that no exigent circumstances existed which would have justified the entry. For the reasons stated below, it is RECOMMENDED that the Defendant's Motion be DENIED.

"Warrantless entries into a person's home are presumptively unreasonable" unless they can be justified by exigent circumstances. United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981) (citing Payton v. New York, 445 U.S. 573, 586 (1980)). Exigent circumstances exist where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a search warrant. United States v. Cephas, 254 F.3d 488, 494-96 (4th Cir. 2001).

#### 1. Probable Cause

Probable cause "'exists where the known facts and circumstances are sufficient to warrant a man of reasonable prudence the belief that contraband or evidence of a crime will be found' in a particular place." United States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). However, it is important to take into account that "'[i]n

5

dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life, on which reasonable and prudent men, not legal technicians, act.'" Draper v. United States, 358 U.S. 307, 313 (1959) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). As a result, the Supreme Court has recognized that police officers can establish probable cause through any reliable sources. Draper, 358 U.S. at 313. These "reliable sources" can include face-to-face informants or individuals who provide information against their penal or proprietary interest. United States v. DeQuasie, 373 F.3d 509, 523 (4th Cir. 2004); United States v. Harris, 403 U.S. 573, 583 (1971).

For example, in DeQuasie, the Fourth Circuit noted that an officer can reasonably rely on information from an informant, who meets with him face-to-face, because it "provides the officer with an opportunity to assess [the informant's] credibility and demeanor and also exposes [the informant] to accountability for making a false statement . . . ." 373 F.3d at 523. Likewise, in Harris, the Supreme Court concluded that admissions from individuals against their penal or proprietary interests can support a finding of probable cause. 403 U.S. at 583. "People do not lightly admit a crime and place critical evidence in the hands of police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility–sufficient at least to support a finding of probable cause to search." Id. Thus, the assessment of probable cause will depend on a "totality of the circumstances" approach. DeQuasie, 459 F.3d at 518.

In this case, the Government asserts that it had probable cause to believe that illegal activity was being conducted at the Defendant's residence based on Pierre's behavior. **[DE-39, p. 8]**. Specifically, the Government noted that: (1) Pierre and the Defendant resided at the same residence

6

at 1124 Bonner Street; (2) over a two-week period, Pierre made several controlled drug sales within close proximity to the residence; (3) Pierre was observed leaving the residence and making a controlled drug sale an hour prior to the Government's warrantless entry; and (4) a green jeep, parked in front of the residence, was the same jeep Pierre used to make his first controlled drug sale. Id. Probable cause does not, "require officials to possess an airtight case before taking action. Often, the pieces of an investigative puzzle will . . . fail to neatly fit, and officers must be given leeway to draw reasonable conclusions . . . ." Taylor v. Farmer, 13 F.3d 117, 121 (4th Cir. 1993). In this case, although the officers' observations did not directly implicate the Defendant in any wrongdoing, based on these facts, it was reasonable for the officers to believe that there was evidence of contraband at 1124 Bonner Street. See United States v. Bynum, 293 F.3d 192, 197 (4th Cir. 2002) (stating that a target's prior criminal activity is material to the probable cause determination).

In addition to Pierre's behavior, Midyette's post-arrest statement also supported the officers' belief that there was evidence of illegal activity inside the Defendant's residence. **[DE-39, p. 4]**. At the hearing, Lt. Davenport testified that at the scene of her arrest, Midyette revealed that she went to the Defendant's residence to purchase drugs.

>   Q: . . . I am asking you when did it happen?
>   A: She actually told me on the scene when I arrested her that - - she was crying and upset. I told her she delivered a quantity of drugs to an informant working with the sheriff's office. She said she didn't know anything about the drugs, that she went to the house to buy some marijuana and that he [Pierre] wanted a ride first.

[Tr. at 31].

Investigator Boyd also testified that no marijuana was found in Midyette's car. Id. at 55. From this fact, it was reasonable for him to infer that it remained in the house. Id. at 55, 66-67.

There are three bases on which to credit Midyette's statement to the police. First, as the Court noted in DeQuasie, by providing the information to the officers "face-to-face," it allowed them a reasonable opportunity to assess her credibility and demeanor and it also decreased the likelihood that she was making a false statement. Second, Midyette's statement was an explicit admission against her own penal interest. By telling the officers that she only went to the Defendant's residence to purchase marijuana, she was implicating herself in criminal activity. Thus, her admission carries its own "indicia of credibility" that could support probable cause to enter the Defendant's residence. Harris, 403 U.S. at 583. Third, Midyette's statement was corroborated by Pierre's previous controlled drug sales. For example, on three separate occasions, Pierre made controlled drug sales to a CW after leaving the Defendant's residence. **[DE-39, p. 3]**. One of the sales involved the purchase of marijuana. Id. As a result, Midyette's statement confirmed the officers' suspicions based on their own independent investigation. Therefore, after considering the totality of the circumstances surrounding the warrantless entry, it is clear that the officers had probable cause to enter the Defendant's residence.

### 2. Exigent Circumstances

"It is well established that even when officers have probable cause to believe that contraband is present in a home, a warrantless search of the home is unlawful unless exigent circumstances exist at the time of entry." United States v. Mowatt, 513 F.3d 395, 400 (4th Cir. 2008). The Fourth Circuit has articulated five factors that are relevant when determining whether exigent circumstances exist: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officer's reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the

contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. See Turner, 650 F.2d at 527-29 (concluding that exigent circumstances existed because the arrest of the defendant was in close proximity to the residence where a suspected drug operation was taking place). However, when making this determination, it is not necessary for the government to offer concrete proof that evidence was about to be destroyed or removed before they could obtain a search warrant. United States v. Reed, 935 F.2d 641, 643 (4th Cir. 1991). Instead, the inquiry should "focus[es] on what an objective officer could reasonably believe." Id. Thus, the crux of this determination is based on the officer's reasonable belief in light of the circumstances at the time of the entry. Id.

In this case, the Government contends that it had to "secure" the Defendant's residence based on exigent circumstances. **[DE-39, p. 4, 8-10]**. Specifically, the Government argues that the officers reasonably believed that the occupants of the residence would be warned of Pierre's arrest prior to the issuance of a search warrant. Id. at 9-10. This belief was based on the fact that Pierre was arrested within a half mile of the residence. Id. at 3. In addition, it is "common practice for drug dealers in high-drug areas, such as the area surrounding 1124 Bonner Street, to communicate with each other regarding any arrests occurring in the area." **[DE-39, p. 10]**. Lt. Davenport testified as to this practice during the suppression hearing. [Tr. 16-18, 28-29]. Thus, if the officers had not entered the Defendant's residence, and then secured it while they obtained a warrant, there was a strong possibility that any evidence of illegality that existed inside the house would have been destroyed or removed. In light of these facts, the Court concludes that exigent circumstances existed to justify the officers' warrantless entry into the Defendant's residence.

9

### B. Independent Source Doctrine

Even if the officers' warrantless entry into the Defendant's residence had been unlawful, the evidence found therein would still be admissible pursuant to the independent source doctrine.

The exclusionary rule precludes the admission of evidence that is recovered during an unlawful entry. United States v. Mowatt, 513 F.3d 395, 403 (4th Cir. 2008). The rule also precludes the admission of evidence that is acquired as a direct or indirect result of that entry. Id. However, there is an exception to the rule that will allow the evidence in limited circumstances; this exception is the "independent source doctrine." Id. at 403-404. The independent source doctrine emphasizes that "evidence seized pursuant to a subsequently issued warrant, although initially discovered during a search following an illegal entry, is admissible so long as 'the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue.'" United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995) (quoting Murray v. United States, 487 U.S. 533, 542 (1988)). A search pursuant to a warrant is not "genuinely independent" in two circumstances. Walton, 56 F.3d at 554. First, if the officers' decision to seek the warrant was prompted by what they discovered during the initial unlawful entry. Id. Second, if information obtained during the unlawful entry was presented to the Magistrate and affected his or her decision to issue the warrant. Id. As a result, to determine whether a search was "genuinely independent," the court should evaluate the affidavit absent the illegally obtained information to assess whether the untainted portion of the affidavit set forth probable cause. Id.; see also, United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (stating that "[t]he inclusion of tainted evidence does not invalidate a search warrant if enough untainted evidence supports it . . . .").

10

Case 4:08-cr-00009-FL   Document 52   Filed 05/08/08   Page 10 of 16

In the affidavit in support of the search warrant, Lt. Davenport affirmed that: (1) on April 9, 2007, investigators from the Sheriff's Department had been conducting surveillance on 1124 Bonner Street; (2) a CW and Pierre made several controlled drug sales in close proximity to the Defendant's residence; (3) subsequent to the final sale between Pierre and the CW, the officers immediately arrested the Pierre and Midyette; (4) during the arrest, Midyette told the officers that she was going to the Defendant's residence to purchase marijuana from Pierre; (5) the officers went to the Defendant's residence to secure it under exigent circumstances; (6) the officers approached the door, heard loud music, knocked, but there was no answer; and (7) when the officers entered the residence they found the Defendant inside and observed cocaine, marijuana, digital scales, and a High Point pistol in plain view in the living room. **[DE-39-7, pgs. 4-5].** His testimony was consistent with these facts. [Tr. at 7-21].

The only "tainted" evidence that was included in the Lieutenant's affidavit was the observation of the cocaine, marijuana, digital scales, and the high point pistol that was in plain view at the time of the initial entry.[4] Otherwise, as discussed in Section 1 above, the affidavit proffered sufficient "untainted" evidence that could support the Magistrate's decision that there was probable cause to conduct a search of the Defendant's residence. Therefore, the evidence that was seized during the officers' search is admissible under the independent source doctrine because the search was "genuinely independent." Walton, 56 F.3d at 554.

---

[4] The affiant also testified that he smelled marijuana once he entered into the Defendant's residence. [Tr. at 20]. However, this observation was not included in his affidavit.

11

C.  **The Defendant's Incriminating Statements**

In his final argument, the Defendant asserts that all of the statements that he made to the police officers, while he was detained, are violative of his Fifth Amendment rights as defined by the Supreme Court in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). **[DE-36, p. 10]**. He also alleges that the statements should be suppressed because they were "another apple from the poisonous tree of the illegal search and seizure." <u>Id.</u> Since the Court has already concluded that the officers' warrantless entry into the Defendant's residence was lawful, his "fruit of the poisonous tree" argument will not be discussed further. However, the Court will address his remaining Fifth Amendment claim.

<u>Miranda</u> warnings must be given by law enforcement officials before a suspect is subjected to custodial interrogation. <u>United States v. Taylor</u>, 985 F.2d 3, 7 (4th Cir. 1993).[5] Interrogation has been defined as not only express questioning, but also "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should know are reasonably likely to elicit an incriminating response* from the suspect.'" <u>Id.</u> (quoting <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980) (emphasis added in the original)).

In this case, the Defendant was taken into custody and detained in a police vehicle outside of his residence while the police executed their search of his home. **[DE-39, p. 6]**. While still in the patrol car, the Defendant "motioned" to one of the officers to approach the vehicle. <u>Id.</u> When the officer approached the vehicle, the Defendant asked "what was going on?" Ex. 4, ¶ 10; Ex. 5, ¶ 13. In response, the officer told the Defendant that they were just about finished searching his home, but still trying to figure out "what the deal was with those guns in the house." <u>Id.</u> Without

---

[5] The Government does not dispute that the Defendant, at the time he made the statements, "was in custody and not received his <u>Miranda</u> warnings." [DE-39, p. 10].

prompting, the Defendant then gave an incriminating statement to the officer about his ownership of the guns.[6] Because the officer's response to the Defendant's inquiry does not constitute interrogation, the Court must determine whether it qualifies as the "functional equivalent" of interrogation. Innis, 446 U.S. at 302.

The "functional equivalence" test turns on an "objective assessment as to whether the police [officer's] statements and conduct would be perceived as interrogation by a reasonable person in the same circumstances." Taylor, 985 F.2d at 7 (citing Arizona v. Mauro, 481 U.S. 520, 527 (1987)). As a result, unless it can be proven that police conduct was designed to elicit an incriminating response from a suspect, mere awareness by the officer of such a possibility is insufficient to constitute the functional equivalent of interrogation. Id. at 8.

Here, as in United States v. Jackson, 863 F.2d 1168, 1172 (4th Cir. 1989) (concluding that the officer's response was not the functional equivalent of interrogation because "[i]t came only in response to a conversation which [the defendant] himself initiated . . . ."), the Defendant initiated the conversation with the officer by motioning to him to approach the police vehicle and asking "what was going on?" After evaluating the officer's response from a reasonable person's perspective, it is clear that it was not "designed" to illicit an incriminating statement from the Defendant. See Taylor, 985 F.2d at 8 (noting that the officer's response to the suspect did not constitute the functional equivalent of interrogation because it was transitory in nature and the suspect initiated the inquiry). Instead, it was in direct response to the Defendant's question.

The Defendant has failed to offer any evidence that the officer knew or should have known that he would admit to ownership of the sawed-off shot gun. See Jackson, 863 F.2d 1172-73 (stating

---

[6] The Defendant did not dispute this characterization of the events in his brief or at the suppression hearing.

13

that the evidence in the record did not indicate that the officer knew or should have known that his brief response to the suspect would have caused the suspect to make an incriminating denial). As a result, the Defendant's admission was a "spontaneous" statement that was voluntarily made. Statements volunteered by a suspect while in custody do not implicate <u>Miranda</u>. <u>Innis</u>, 446 U.S. at 300; <u>see also</u>, <u>United States v. Williams</u>, No. 99-4583, 2001 U.S. App. LEXIS 13296, * at 4 (4th Cir. 2001) (concluding that "it is . . . well settled that spontaneous or volunteered statements that are not the product of interrogation or its functional equivalent are not barred by <u>Miranda</u>, even if the defendant is in custody when the statements are made") (citations omitted). Therefore, based on the foregoing reasons, it is RECOMMENDED that the Defendant's Motion to Suppress his statements be DENIED.

**III. Conclusion**

The Court finds that the officers here lawfully entered the Defendant's residence based on probable cause and exigent circumstances. These officers also obtained a search warrant to search the premises, and the affidavit used to obtain this warrant stated probable cause even absent the information they obtained after entering the Defendant's residence. Under these circumstances, the officers' actions did not violate the Defendant's rights pursuant to the Fourth Amendment. Accordingly, it is HEREBY RECOMMENDED that the Defendant's motion to suppress the evidence seized by law enforcement from his residence on April 9, 2007, be DENIED in all respects. It is further RECOMMENDED that his motion to suppress the statements that he made to the officers while he was being detained, be DENIED in all respects.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 8th day of May, 2008.

_____
William A. Webb
U.S. Magistrate Judge